******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# YUN ZHOU *v.* HAO ZHANG
## (SC 20146)

Robinson, C. J., and Palmer, D'Auria, Mullins,
Kahn and Vertefeuille, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant had been dissolved, appealed, challenging the trial court's custody orders and claiming that the trial court improperly declined to enforce the parties' purported agreement to revoke an earlier postnuptial agreement and incorrectly determined that the postnuptial agreement was enforceable. Approximately six years into the parties' marriage, during which they had two children, the parties, after seeking and obtaining the advice of counsel, entered into a postnuptial agreement pursuant to which they agreed that, if either party sought a divorce between certain specified dates, the plaintiff would receive a certain amount of alimony and a specified distribution of marital property. Thereafter, the plaintiff filed for divorce when the postnuptial agreement was effective, and the parties entered into divorce mediation. The parties retained S as a mediator. The defendant agreed to retain S in reliance on S's representation on S's website that mediation was voluntary and that any party could withdraw from mediation without sacrificing his or her rights. Moreover, the mediation agreement between the parties and S provided that the parties agreed to keep all statements made and materials and documents prepared and disclosed during mediation confidential and that this confidentiality would extend to any future judicial proceedings. Shortly after mediation commenced, the plaintiff sent an e-mail to S and the defendant, requesting a revocation of the parties' postnuptial agreement. S responded in an e-mail addressed to both the plaintiff and the defendant that he could help with that matter but that the ultimate separation agreement that the parties would reach at the conclusion of mediation would govern and would effectively override the parties' postnuptial agreement. S nevertheless prepared a revocation agreement, which the parties signed after making full disclose to one another regarding their financial information. Although the plaintiff received legal advice from her own attorney in conjunction with the signing of the revocation agreement, the defendant attempted to obtain but was unsuccessful in securing legal advice from an independent attorney prior to signing the revocation agreement. Mediation ultimately ended without the parties reaching a separation agreement, and the matter was tried to the court. The trial court heard testimony from H, a court-appointed psychologist who performed a forensic custody evaluation, and B, the guardian ad litem for the children, among other witnesses. The trial court determined that, with the exception of one provision that was severable from the remainder of the postnuptial agreement, that agreement was enforceable. The trial court also determined that the agreement purporting to revoke the postnuptial agreement was unenforceable because, inter alia, the defendant had no legal counsel when he signed the revocation agreement, the defendant relied on a provision in the mediation agreement signed by both parties that all materials prepared during mediation, presumably including the purported revocation of the postnuptial agreement, would remain confidential and were to be used solely in an effort to obtain a complete settlement that never occurred, and the defendant relied on S's representations on his website that the defendant could withdraw from mediation at any time without sacrificing his rights, including those previously guaranteed in the postnuptial agreement. The trial court rendered judgment dissolving the parties' marriage, awarding alimony and a share of the marital assets to the plaintiff in accordance with the parties' postnuptial agreement, and awarding the parties joint legal and physical custody of the children but granting the defendant final decision-making authority as to matters concerning the children about which the parties disagreed. On the plaintiff's appeal, *held*:

1. The trial court correctly concluded that the parties' agreement purporting to revoke their postnuptial agreement was unenforceable: the defen-

dant's purported understanding that the revocation agreement would not be binding unless the parties reached a full and final settlement of the disputed issues was supported by S's representations to the defendant on S's website, in S's e-mail to the parties during mediation, and in the mediation agreement, and the trial court's finding that the defendant's understanding was based on those representations was amply supported by his testimony; accordingly, the revocation agreement was unenforceable against the defendant over his objection because a full and final resolution of the issues during mediation was a condition precedent to the enforcement of the revocation agreement, and it was undisputed that no such resolution ever occurred; moreover, there was no merit to the plaintiff's claim that the trial court's consideration of S's representations on his website, in the e-mail to the parties, and in the mediation agreement for the purpose of ascertaining the defendant's understanding and intent with respect to the revocation agreement violated the parol evidence rule, as that rule does not prevent a party from relying on extrinsic evidence to establish the existence of a condition precedent to the formation of a contract, and, therefore, the trial court properly considered parol evidence in evaluating the defendant's claim that the revocation agreement was not binding in the absence of a final settlement agreement.

2. The plaintiff could not prevail on her claim that the trial court had incorrectly determined that the parties' postnuptial agreement was enforceable because it was fair and equitable at the time of execution and was not unconscionable at the time of dissolution: the trial court, in considering the entirety of the evidence, reasonably concluded that the plaintiff's decision to enter into the postnuptial agreement was voluntary and not the product of duress; moreover, the evidence supported the trial court's finding that the plaintiff understood her rights and obligations under the postnuptial agreement notwithstanding its length and complexity, as the plaintiff was highly educated, had independent counsel during the negotiation and execution of that agreement, and acknowledged in the agreement her complete understanding of the effects of the agreement; furthermore, the plaintiff failed to identify a single change of circumstance since the execution of the postnuptial agreement that would warrant the conclusion that its enforcement at the time of dissolution would be unconscionable.

3. The trial court did not abuse its discretion when, in its custody orders, it granted the defendant final decision-making authority with respect to the parties' children in situations in which the parties were unable to agree: notwithstanding the plaintiff's claim that the trial court improperly based its custody orders on the testimony of B, the guardian ad litem, on the ground that B testified that she had not seen the children in two years, there was nothing in the record to suggest that B did not conduct an investigation into the best interests of the children during the pendency of the dissolution, because, even though B met with the children only once, shortly after her appointment, due to their tender years and to keep them removed from their parents' marital conflicts, B was in regular communication with the parties, read the reports prepared by H, the court-appointed psychologist, and consulted with him about his findings, and attended all court proceedings and depositions; moreover, the plaintiff had a full and fair opportunity to cross-examine B about any possible deficiencies concerning the time she spent with the children and how, if at all, any such deficiencies impaired her ability to form a legitimate opinion as to their best interests, and the plaintiff failed to demonstrate that she was prejudiced by B's limited contact with the children; furthermore, H, who spent far more time evaluating the children, largely agreed with B's observations and recommendations, and the trial court's granting of final decision-making authority to the defendant was based on its finding that the defendant had more insight into the children's developmental needs, activities, education and environment, which in turn was based on the testimony of B as well as other witnesses.

Argued November 14, 2018—officially released February 11, 2020

*Procedural History*

  Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the case was transferred to the Regional Family Trial Docket at Mid-

dletown and tried to the court, *Gould, J.*; judgment dissolving the marriage and granting certain other relief, from which the plaintiff appealed. *Affirmed.*

*Gaetano Ferro*, with whom was *Olivia M. Hebenstreit*, for the appellant (plaintiff).

*Kenneth J. Bartschi*, with whom were *Scott T. Garosshen* and, on the brief, *Wayne Effron* and *Reuben Midler*, for the appellee (defendant).

*Campbell D. Barrett* and *Johanna S. Katz* filed a brief for the guardian ad litem.

*Opinion*

PALMER, J. The plaintiff, Yun Zhou, appeals from the judgment of the trial court dissolving her marriage to the defendant, Hao Zhang. On appeal, the plaintiff claims that the trial court (1) improperly declined to enforce the parties' purported written revocation of their postnuptial agreement[1] (revocation agreement), (2) incorrectly determined that the postnuptial agreement was enforceable, and (3) improperly awarded the parties joint legal and physical custody of their minor children, with the defendant having final decision-making authority. We reject the plaintiff's claims and, therefore, affirm the judgment of the trial court.

The record reveals the following relevant facts, as found by the trial court and supplemented by the record, and procedural history. The parties were married in 2006 and have two children, a son and a daughter, who were born in 2006 and 2008, respectively. "The plaintiff . . . is in good health. She, like the defendant, is a native of China and a permanent resident of the United States.[2] She has a doctoral degree in mechanical and nuclear engineering from the University of California, Berkeley. She was employed as a research fellow at the University of Maryland and at the John F. Kennedy School of Government at Harvard University from 2007 [until] 2013. Her highest salary from those positions at that time was $50,000 per year. In addition, she worked as a private consultant from 2012 through 2014, earning, at her highest point from both positions, income of $77,500 a year. She has published numerous papers and articles in the field of nuclear engineering. She has not worked outside of the home since 2014. She is currently studying for a master's degree in public administration at Columbia University. She plans to resume a career in public policy analysis or research after obtaining her master's degree . . . . Based on the foregoing, the [court] finds that the plaintiff has an annual earning capacity of $77,500.

"The defendant . . . [also] is in good health. He has a doctoral degree in computer science from the University of California, Berkeley. He is employed as a managing director for Two Sigma Investments in New York City. His base salary is $250,000 a year, according to his most recent financial affidavit.[3]

"The parties are . . . joint owners of the marital residence . . . in Greenwich . . . . The property has a fair market value of $3.1 million, and is encumbered by a mortgage in the amount of $2,011,311, yielding equity in the amount of $1,088,689. In addition, the defendant maintains two rental properties for himself, one in New York City and another in Greenwich . . . with a total monthly rental fee of $14,475. . . .

"The [parties'] children are enrolled in myriad activities, with [the son] involved [in] tennis, piano, water

polo, and chess, and [the daughter] involved in swimming, flute, art and dance." (Footnote added; footnote altered.)

On February 25, 2012, after seeking and obtaining the advice of counsel, disclosing to one another their assets and liabilities, and exchanging financial affidavits, the parties entered into and signed a properly acknowledged postnuptial agreement. That agreement provides that, if one of the parties commenced a dissolution action between February 1, 2013, and February 1, 2015, the plaintiff would receive "$350,000 per year ($29,167 per month) of alimony [for] . . . a time period equal to one half the length of the parties' marriage as measured from the marriage date to the date of the commencement of the [dissolution] [a]ction." (Internal quotation marks omitted.) The plaintiff also would receive the marital residence and one third of the parties' aggregate net worth[4] as of the date of the dissolution decree. The postnuptial agreement further provides: "If the market price of the house less the mortgage loan exceeds . . . one third of the [p]arties' [a]ggregate [n]et [w]orth, the [plaintiff] will not receive any portion of either party's assets. Otherwise, the [plaintiff] will acquire the amount of [one third] of the [p]arties' [a]ggregate [n]et [w]orth less the equity [in the] marital [residence] (the market price of the marital [residence] less the mortgage loan)." Paragraph 8.1 of the postnuptial agreement permits revocation "if made in writing and executed with the same formality as [the] [a]greement." In addition, the postnuptial agreement has a severability clause, which provides that, if "any provision, clause, section or paragraph of [the] [a]greement is invalid, is void or unenforceable for any reason, it shall be deemed severable from the remainder of the [a]greement."

Thereafter, the parties concluded that their marriage had broken down irretrievably, and, on October 23, 2013, the plaintiff filed for divorce. In an effort to reach a mutually agreeable resolution of the matter, the parties decided to enter into mediation. Upon receiving the names of two prospective mediators from the plaintiff, the defendant visited the website of one of them, Maurice Segall. Among other things, Segall's website contained the following representations about the advantages of mediation: "The couple has *control* over the process, and *control* over the decisions that affect [their] lives and the lives of [their] children." (Emphasis in original.) "With the help of the mediator, the couple is able to make their own *fully informed decisions*." (Emphasis in original.) "Mediation is *informal* and *confidential*." (Emphasis in original.) "Mediation is entirely *voluntary*. Anyone can leave mediation at any time, without sacrificing any of [his or her] rights." (Emphasis in original.) In reliance on this language, the defendant agreed to retain Segall, and, in October, 2013, Segall and the parties signed a mediation agreement, which

provided in relevant part: "The [p]arties agree to keep confidential all statements made during the mediation, as well as all written, photographic, electronic or printed material and documents prepared or presented during the mediation, except that either [p]arty may share that information with his or her attorney. This agreement regarding confidentiality shall pertain to all circumstances, including but not limited to any civil and criminal proceedings."

Soon after mediation commenced, the plaintiff informed the defendant that she favored revoking the parties' postnuptial agreement. According to the defendant, he told the plaintiff that, "under the umbrella of the mediation, we could try this [revocation] and see if we can negotiate without the postnuptial [agreement]." On December 20, 2013, the plaintiff sent Segall and the defendant an e-mail inquiring as to whether Segall could assist the parties in revoking the postnuptial agreement. In an e-mail response to the parties that same day, Segall stated: "Yes, I can help with the [postnuptial] matter; however, as a practical matter the ultimate separation agreement that you'll reach will contain the terms that will govern, and would effectively override the [postnuptial agreement]. [Let's] discuss this when we next meet." Segall then proceeded to prepare a document entitled "Revocation of Postnuptial Agreement."

Prior to signing the revocation agreement, the parties again made full disclosure to one another of their assets and liabilities and exchanged financial affidavits. In a series of e-mails beginning and concluding with Segall's e-mails to the parties dated January 10 and 17, 2014, respectively, Segall and the parties discussed the drafting of the revocation agreement and scheduled a time to sign it. During this period, the plaintiff's attorney, Andrew Nemiroff, advised the plaintiff on the revocation. In particular, he advised the plaintiff to have Segall remove language in the original draft agreement indicating that the agreement was supported by consideration because, as the plaintiff testified at trial, "no new promises, undertakings, or consideration [was] exchanged in connection with the revocation . . . agreement." At about this same time, the defendant, who previously had not been represented during mediation, tried to contact attorney Wayne Effron, who had represented him in connection with the parties' postnuptial agreement, but Effron did not respond to the defendant's attempts to reach him. Nevertheless, on January 18, 2014, the parties duly executed the revocation agreement.[5]

According to the defendant, he signed the agreement because he understood that all documents and agreements created during the mediation process would remain confidential and were to be used solely by the parties for the purpose of obtaining a complete settle-

ment agreement, that is, an agreement that resolved all of the disputed issues. Consistent with this understanding, he further understood that, because "mediation is an all or nothing process," any document that he signed would have no legal effect unless and until the mediation process resulted in the parties' reaching such a complete agreement. The defendant's understandings regarding the agreement were based on the representations set forth on Segall's website concerning the right of either party to terminate mediation at any time without sacrificing any of his or her preexisting rights, Segall's December 20, 2013 e-mail to the parties indicating that revocation of the postnuptial agreement was not necessary because it effectively would be superseded by any mediated settlement between the parties, and paragraph 4 (a) of the mediation agreement itself, which provides that all documents prepared or presented during mediation were to remain confidential for all purposes, including judicial proceedings.[6]

During mediation, Segall also prepared a proposed parenting plan for the parties, informing them that, as with the revocation agreement, this plan would be used solely in an effort to obtain a complete settlement agreement and would not become effective unless ratified by the court. On February 26, 2014, the parties signed the proposed parenting plan, which, with the consent of both parties, subsequently was filed with the court so as to meet a case management deadline that had been set in their pending dissolution action. The court, however, never canvassed the parties with respect to the agreement; nor was the plan ever incorporated into any order of the court. In July, 2014, mediation ended without the parties reaching a settlement agreement. On September 4, 2014, following the defendant's decision to move out of the marital home, where both parties had been residing, the defendant filed a motion to modify the proposed parenting plan, requesting that the parties be given joint physical and legal custody of their minor children. The court, however, never ruled on that motion.

A dissolution trial was conducted over a period of eighteen days in October, November, and December, 2016, during which the trial court heard extensive testimony from several witnesses, including each of the parties; Harry Adamakos, a court-appointed psychologist who performed a forensic custody evaluation; Attorney Bonnie L. Amendola, the guardian ad litem for the parties' minor children; Bryan J. Matthews, a friend of the plaintiff; and Kane Winn, a private investigator retained by the defendant. On January 3, 2017, the trial court issued a memorandum of decision in which it found that the parties' marriage had broken down irretrievably, with more fault attributable to the plaintiff, and entered a decree dissolving the marriage. The court awarded the parties joint legal and physical custody of their minor children with the defendant hav-

ing final decision-making authority. The court explained its reasons for awarding final decision-making authority to the defendant as follows: "Individually, both the plaintiff and the defendant are good parents. However, the defendant has more insight into the children's developmental needs, activities, education and environment. He has been able to structure his work time to [have] additional time off for the children on Wednesdays, Thursdays and Fridays. The plaintiff, on the other hand, is deceptive, defensive, rigid, impulsive, manipulative, and lacks objectivity regarding the defendant. The plaintiff is controlling and authoritative in parental situations that involve the defendant. The defendant has been marginalized from his children's lives and, as such, does not trust the plaintiff. The plaintiff has belittled the defendant's family and told the defendant that his job has no value, that he is merely a 'Wall Street guy chasing dollars.' The plaintiff lied to the guardian ad litem and the forensic evaluator about her personal life and has, thus, forced the children into 'secret keeping' from the defendant. There has been little to no coparenting between them; instead, the plaintiff unilaterally schedules the children's activities and social events, and only tells the defendant about them after they have been scheduled or have occurred."

With respect to the parties' revocation agreement, the trial court acknowledged that "there is scant Connecticut legal authority [concerning] the requirements for an effective revocation of a postnuptial agreement." Given the dearth of such authority, the trial court subjected the agreement to the same special scrutiny that courts apply in determining the enforceability of a postnuptial agreement. Under that standard, which was first articulated by this court in *Bedrick* v. *Bedrick*, 300 Conn. 691, 17 A.3d 17 (2011), a postnuptial agreement is enforceable "only if it complies with applicable contract principles, and the terms of the agreement are both fair and equitable at the time of execution and not unconscionable at the time of dissolution." (Footnote omitted.) Id., 703–704. "[T]he terms of a postnuptial agreement are fair and equitable at the time of execution if the agreement is made voluntarily, and without any undue influence, fraud, coercion, duress or similar defect. Moreover, each spouse must be given full, fair and reasonable disclosure of the amount, character and value of property, both jointly and separately held, and all of the financial obligations and income of the other spouse. . . . [I]n determining whether a particular postnuptial agreement is fair and equitable at the time of execution, a court should consider the totality of the circumstances surrounding execution. A court may consider various factors including the nature and complexity of the agreement's terms, the extent of and disparity in assets brought to the marriage by each spouse, the parties' respective age, sophistication, education, employment, experience, prior marriages, or other

traits potentially affecting the ability to read and understand an agreement's provisions, and the amount of time available to each spouse to reflect [on] the agreement after first seeing its specific terms . . . [and] access to independent counsel prior to consenting to the contract terms. . . .

"With regard to . . . whether a postnuptial agreement is unconscionable at the time of dissolution, [that] . . . determination . . . is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 704–705. "[T]he question of whether enforcement of an agreement would be unconscionable is analogous to determining whether enforcement of an agreement would work an injustice."[7] Id., 706.

Applying this standard to the parties' revocation agreement, the trial court found, inter alia, that, "prior to signing the document, the parties revealed their entire personal and joint assets and liabilities to one another, and provided the other with a full, complete and current financial affidavit. Both parties signed the agreement." The trial court also found, however, that, "[c]ontrary to the terms of the alleged revocation, and unlike the circumstances surrounding the negotiation and signing of the postnuptial agreement . . . the defendant had no legal counsel at the time he signed the revocation. The defendant was told by the mediator [Segall] to sign the alleged revocation document only six days after it was broached to him, and he informed [Segall] that he was unable to contact his attorney during that time period. . . . Consequently, the defendant . . . was never advised that the plaintiff might seek to enforce [the revocation agreement], and, arguably, the effect of arguing that he was coerced into signing it or, in the alternative, signed it under duress."

In addition to its finding that the defendant did not have the requisite access to counsel, the trial court determined that the revocation agreement was unenforceable as a matter of law because "the defendant relied on paragraph 4 (a) of the parties' mediation agreement, as well as correspondence from [Segall] . . . that all written materials prepared during the mediation, presumably including the alleged revocation of the postnuptial agreement, would remain confidential and were to be used solely in an effort to obtain a complete settlement of all terms, which never occurred. In addition to the alleged revocation agreement, a proposed parenting plan . . . was also [drafted] and utilized solely in that regard, although it was never approved by the court." (Citations omitted.) The court also found that the defendant had relied on "the wording on [Segall's] website . . . that he . . . could withdraw from the mediation at any time without sacrificing any of his rights, including those previously negotiated, drafted

and included in the postnuptial agreement. As such, [Segall] misrepresented the efficacy and use of the purported revocation agreement." (Citation omitted.)

Because of its conclusion that the revocation agreement was unenforceable, the trial court also was required to determine the enforceability of the parties' postnuptial agreement. With the exception of one provision that the trial court found to be severable,[8] the court concluded that that postnuptial agreement was enforceable. Before doing so, the trial court identified all of the criteria, as spelled out in *Bedrick*, that must be met before a postnuptial agreement may be found to be enforceable, including the requirements that the agreement was fair and equitable at the time of execution and not unconscionable at the time of dissolution. The trial court then found that, "prior to finalizing the [postnuptial agreement], the parties revealed their entire personal and joint assets and liabilities to one another, and each provided the other with a full, complete and current financial affidavit. In addition, both parties had independent legal counsel during the negotiation, pendency and execution of the agreement. Both parties signed the agreement, and both signatures were witnessed by two independent parties. Both parties . . . have doctoral, anticipated masters, and undergraduate college degrees, and, as such, understood their rights and obligations under the terms of the [postnuptial agreement]. There is no evidence of undue influence, fraud, coercion, duress or similar defect concerning the execution of the [postnuptial agreement]."

In light of these findings, the trial court ordered the defendant to pay alimony to the plaintiff in the amount of $350,000 per year, or $29,167 per month, in accordance with the terms of the postnuptial agreement. The trial court further ordered that "[t]he defendant . . . pay child support to the plaintiff in the amount of $676 per week, in accordance with the state . . . child support guidelines." The trial court also ordered the defendant to "pay the reasonable costs of each child's private day school tuition and books" and "90 percent . . . of the cost of any and all uninsured and/or unreimbursed medical [expenses] for each of the parties' two minor children." Finally, in accordance with the parties' postnuptial agreement, the court awarded the plaintiff $1,326,849, which represented one third of the parties' aggregate net worth as defined by the agreement.

On February 8, 2017, the court amended the child support orders, explaining that, although the presumptive minimum child support amount is $708 per week and the presumptive order under the child support guidelines would require the defendant to pay 100 percent of the children's unreimbursed medical expenses, there are three valid deviation criteria applicable in this case. The court identified these criteria as follows: (1) "the plaintiff's earnings capacity is an annual, pretax

amount of $77,500"; (2) "the order of shared physical custody"; and (3) "the defendant's private school education obligations to the minor children."

On appeal,[9] the plaintiff claims that the trial court incorrectly concluded that the parties' purported agreement to revoke the postnuptial agreement was unenforceable and that their postnuptial agreement was enforceable. The plaintiff also claims that the trial court incorrectly awarded the parties joint legal and physical custody of their minor children with the defendant having final decision-making authority. We reject each of these contentions, which we discuss in turn.[10]

I

We first address the plaintiff's contention that the trial court incorrectly concluded that the parties' written agreement purporting to revoke their postnuptial agreement was unenforceable. The plaintiff asserts that the trial court's heightened scrutiny of that agreement was unwarranted because, unlike a postnuptial agreement, which removes the issues of alimony and property division from the court's purview, the revocation of a postnuptial agreement returns those issues to the court for adjudication, thereby placing the parties "on equal footing" in any future dissolution action. The plaintiff further claims that, even if the revocation agreement was properly the subject of special scrutiny, the record does not support the trial court's refusal to enforce it for the reasons articulated by the court, namely, because the defendant did not have access to an attorney prior to its execution and because the defendant was led to believe, and did believe, that the revocation agreement was not binding on the parties if they were unable to reach a mediated settlement of their dispute. The plaintiff finally argues that, even if the trial court's findings are supported by the record, the court incorrectly relied on parol evidence to ascertain the import of the parties' revocation agreement. The defendant, for his part, maintains that the trial court properly applied special scrutiny to the parties' agreement but that, even without such scrutiny, the trial court's refusal to enforce the agreement is supported by ordinary contract principles. We agree with the defendant that the trial court's decision is sustainable under established contract law.

As the trial court observed in its memorandum of decision, there is no case law in this state—or, to our knowledge, in any other jurisdiction— identifying the legal standard by which the validity of an agreement purporting to revoke a postnuptial agreement is to be evaluated. This dearth of authority is undoubtedly due to the fact that, unlike premarital agreements, which are common, postnuptial agreements are not. Rarer still are agreements between spouses purporting to revoke a postnuptial agreement. For purposes of the present case, however, it is unnecessary for us to decide whether an agreement to revoke a postnuptial agree-

ment should be subject to the same heightened scrutiny as the postnuptial agreement itself. We need not do so in light of the fact that the trial court's finding that the defendant signed the revocation agreement only because he reasonably understood that it would not be binding unless the parties reached a full and final settlement of the disputed issues constitutes a valid basis for sustaining that court's judgment under ordinary contract principles.

As we previously discussed, the trial court found that the defendant signed the revocation agreement in reliance on the representations on Segall's website concerning the purpose and scope of mediation, statements contained in Segall's December 20, 2013 e-mail to the parties, and the provisions of paragraph 4 (a) of the parties' mediation agreement. As the trial court explained, these materials together permitted the defendant to withdraw from the mediation at any time without sacrificing any of his rights, including his rights under the parties' 2012 postnuptial agreement, and they further provided that all writings prepared during the mediation, including the parties' revocation agreement, were confidential and for use solely and exclusively to facilitate a complete settlement of their pending case, which, of course, never occurred. Thus, the defendant's purported understanding that he could terminate the mediation at any time, and that, if he did, the revocation agreement would not be enforceable, was fully supported by the representations on Segall's website, in the December 20, 2013 e-mail, and in the mediation agreement. The trial court's finding that the defendant did, in fact, rely on these representations is itself amply supported by the defendant's testimony.

As we also noted previously, the trial court couched its findings in terms of misrepresentation. More specifically, the court stated that Segall had "misrepresented the efficacy and use of the purported revocation agreement," evidently because Segall failed to clarify that, despite the aforementioned representations to the contrary, the revocation agreement was binding on the parties even if they ultimately were unsuccessful in reaching a mediated settlement of their case. We are not persuaded, however, that principles of misrepresentation provide the proper lens through which to view the trial court's underlying factual findings. It is apparent, rather, that, in light of the representations on which the plaintiff relied in entering into the revocation agreement, the agreement was not enforceable unless the parties successfully mediated the disputed issues. Put differently—in terms well established in contract law—a full and final resolution of those issues was a condition precedent to the enforceability of the revocation agreement. See, e.g., *Southport Congregational Church—United Church of Christ* v. *Hadley*, 320 Conn. 103, 113, 128 A.3d 478 (2016) ("[a] condition precedent is a fact or event [that] the parties intend must exist or take

place before there is a right to performance" (internal quotation marks omitted)); *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 180–81 n.50, 84 A.3d 840 (2014) ("conditions precedent to the formation of a contract involve issues of offer and acceptance [that] precede and determine the formation of a contract" (internal quotation marks omitted)); *Luttinger* v. *Rosen*, 164 Conn. 45, 48, 316 A.2d 757 (1972) ("[i]f the condition precedent is not fulfilled the contract is not enforceable"); *McIsaac* v. *Hale*, 104 Conn. 374, 379, 132 A. 916 (1926) ("[a] condition precedent is one [that] must be performed before the agreement of the parties becomes a valid and binding contract"). Moreover, in determining whether performance of the revocation agreement was predicated on the occurrence of a condition precedent, namely, the parties' successful mediation of their dispute, the trial court was free to credit the defendant's testimony. See, e.g., *Bender* v. *Bender*, 292 Conn. 696, 729, 975 A.2d 636 (2009) ("[t]o the extent that there was conflicting testimony as to whether the parties . . . had agreed to . . . a condition precedent to the agreement becoming a valid contract, the trial court was entitled to credit the testimony of the plaintiffs over that of the defendants concerning that matter"). Because the evidence supports the trial court's conclusion that the enforceability of the revocation agreement was conditioned on the parties reaching a successful resolution of the case, and because it is undisputed that no such resolution was ever reached, the court correctly determined that the revocation agreement was not enforceable against the defendant over his objection.

The plaintiff challenges the trial court's determination that the revocation agreement was not enforceable on two grounds. First, she contends that the trial court's reliance on the representations on Segall's website, in Segall's December 20, 2013 e-mail to the parties and in the mediation agreement for the purpose of ascertaining the defendant's understanding and intent with respect to the revocation agreement violates the parol evidence rule. The plaintiff further argues that the trial court's determination regarding the defendant's understanding that the revocation agreement was not binding if the parties did not reach a final settlement agreement is not supported by the evidence. We disagree with both claims.

With respect to the plaintiff's first contention, it is well established that "the parol evidence rule is not a rule of evidence, but a substantive rule of contract law" that bars the use of extrinsic evidence to vary the terms of an otherwise plain and unambiguous contract. (Internal quotation marks omitted.) *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 779–80, 653 A.2d 122 (1995). The rule does not prohibit the use of extrinsic evidence for other purposes, however, such as to prove mistake, fraud or misrepresentation in the

inducement of the contract. See, e.g., *Sims* v. *Honda Motor Co.*, 225 Conn. 401, 416, 623 A.2d 995 (1993) ("[t]he parol evidence rule . . . is not absolute . . . but admits of various exceptions, some of which are based on equitable considerations"); *Paiva* v. *Vanech Heights Construction Co.*, 159 Conn. 512, 521, 271 A.2d 69 (1970) ("[t]he parol evidence rule has no application [when] there has been fraud in the inducement of the contract, and parol evidence is ordinarily admissible to prove fraudulent misrepresentations"); *Warman* v. *Delaney*, 148 Conn. 469, 474, 172 A.2d 188 (1961) (parol evidence was properly admitted because proponent of such evidence was "not seeking to add to, subtract from or alter the terms of the written contract itself" but, rather, was seeking to establish "material misrepresentation in the inducement of the contract").

The rule also does not prevent a party from using extrinsic evidence to establish the existence of a condition precedent to the formation of a contract. See, e.g., *Cohn* v. *Dunn*, 111 Conn. 342, 346, 149 A. 851 (1930) ("[a] collateral agreement that the writing is not to take effect until the happening of some other event . . . may . . . be proved by parol [evidence]"). As we explained long ago, "[t]he rule . . . is, that [one] may show that a writing purporting to be a contract never came into existence as a contract, or has ceased to be a contract, and [this] may [be] show[n] . . . by evidence outside of the writing. This . . . rule is not an exception to the [parol evidence rule or] an infringement of it." *Burns & Smith Lumber Co.* v. *Doyle*, 71 Conn. 742, 745, 43 A. 483 (1899). "The practical distinction between the two rules . . . is that evidence to vary the terms of an agreement in writing is not admissible, but evidence to show that there is not an agreement at all is admissible." (Citation omitted; internal quotation marks omitted.) Id., 745–46. Accordingly, the trial court correctly considered parol evidence to evaluate the defendant's claim that the revocation agreement was not binding in the absence of a final settlement agreement.[11]

Nor do we agree with the plaintiff that the trial court's interpretation of that evidence and its finding that the defendant relied on it were incorrect as a matter of law. As we previously explained, Segall's website characterized mediation as "entirely voluntary"; (emphasis omitted); and stated further that either party "can leave mediation at any time, *without sacrificing any of* [*his or her*] *rights*." (Emphasis added.) In his December 20, 2013 e-mail to the parties, Segall stated that, even though he could and would draft a revocation agreement at the parties' request, such an agreement was not necessary because the parties' mediated resolution of the case would "effectively override" the postnuptial agreement. Although this statement is explicit as to why a revocation agreement would be unnecessary if the parties *were* to reach a mediated settlement of their

case, Segall's failure to explain that such an agreement would have materially affected the parties' financial relationship in the event that they *failed* to resolve the case strongly suggests that Segall himself understood that the agreement also would not be binding if the parties did not reach a settlement. Finally, the mediation agreement expressly provided that the parties could terminate mediation "at any time" and that both sides "agree to keep confidential all statements made during the mediation, as well as all written, photographic, electronic or printed material and documents prepared . . . during the mediation . . . . This agreement regarding confidentiality *shall pertain to all circumstances, including but not limited to any civil and criminal proceedings*." (Emphasis added.) The plaintiff's contention to the contrary notwithstanding, we agree with the trial court's interpretation of this evidence as entitling the defendant, irrespective of the existence of the revocation agreement, to walk away from mediation at any time without sacrificing any of his rights under the postnuptial agreement.[12] Furthermore, as we previously indicated, the trial court had every right to credit the defendant's testimony that he understood and relied on these representations in deciding to enter into the revocation agreement. Accordingly, we agree with the defendant that the revocation agreement was unenforceable once he elected to terminate mediation without reaching a resolution of the parties' dispute.[13]

## II

We next address the plaintiff's claim that the trial court incorrectly determined that the parties' postnuptial agreement was enforceable because it was fair and equitable at the time of execution and not unconscionable at the time of dissolution, as required by *Bedrick*. In support of her contention, the plaintiff maintains, contrary to the determination of the trial court, that the agreement was not fair and equitable at the time of execution, primarily because (1) she signed it under duress, after the defendant threatened to divorce her if she refused to do so, and (2) the agreement's terms are both complex and prolix. The plaintiff further contends that enforcement of the agreement would be unconscionable because the share of the marital estate allocated to the defendant under the agreement is "grossly disproportionate" to what the plaintiff otherwise would be awarded. We are not persuaded by these claims.[14]

As we previously indicated, the trial court, in concluding that the postnuptial agreement was fair and equitable, expressly found that there was no "undue influence, fraud, coercion, duress or similar defect" concerning the execution of the agreement. The plaintiff disputes this finding, arguing that it is unsupported in light of what she characterizes as her uncontradicted testimony that she signed the postnuptial agreement under duress. Even if we were to agree with the plaintiff that the

defendant failed to adduce evidence directly contradicting her testimony in this regard, the trial court was not bound to accept that testimony as true. As this court previously has explained, "[i]n evaluating [uncontradicted] testimony, the trial court must assess the credibility of the testifying witness and consider the presence or absence of corroborating evidence. Since the trial court as the finder of fact is uniquely competent to determine the credibility and weight to be accorded to evidence, the scope of our review of the trial court's decision to accept or reject the [witness'] uncontradicted testimony is limited. After considering the totality of the record in the light most favorable to sustaining the trial court's factual conclusions, we will disturb the trial court's findings only if we determine that they are clearly erroneous." *Bieluch* v. *Bieluch*, 199 Conn. 550, 555–56, 509 A.2d 8 (1986). The plaintiff has failed to make such a showing. Because the trial court was able to assess the plaintiff's credibility firsthand—and expressly found her credibility to be lacking—we have no reason to question the trial court's finding that, despite her testimony to the contrary, the plaintiff entered into the agreement voluntarily.

It bears emphasis, moreover, that the plaintiff's testimony claiming duress did not go unchallenged by the defendant. For example, article XVIII of the postnuptial agreement expressly provides that "[t]he [plaintiff] acknowledges that she has carefully read this [a]greement, that she has given due consideration to the [a]greement and that [the] [a]greement is in all respects fair and equitable, that it is being entered into voluntarily, and that it is not the result of any duress or undue influence exercised by either party on the other. . . . The [plaintiff] further acknowledges that this [a]greement was prepared at her instigation and signed as a result of her insistence." Considering the entirety of the evidence, the trial court reasonably concluded that the plaintiff's decision to enter into the postnuptial agreement was voluntary and not the product of duress.

We also reject the plaintiff's contention that the agreement was unfair and inequitable at the time of execution because it is complicated and spans thirty-five pages. Although the length and complexity of a postnuptial agreement comprise one of many factors courts may consider in evaluating the enforceability of such an agreement; *Bedrick* v. *Bedrick*, supra, 300 Conn. 705; that factor is relevant only insofar as it bears on the question of whether the parties understood the agreement's terms at the time of execution. In the present case, the evidence fully supports the trial court's finding that the plaintiff understood her rights and obligations under the agreement notwithstanding its length and complexity. The plaintiff, like the defendant, is highly educated, and holds a PhD in mechanical and nuclear engineering from the University of California, Berkeley. In addition, the plaintiff had independent legal counsel

to advise her during the negotiation and execution of the postnuptial agreement. Finally, the agreement itself provides that "[t]his [a]greement was drafted cooperatively by the parties' counsel (in consultation with the parties)" and that "both [parties] and their respective counsel have had a full and fair opportunity to negotiate and review the terms [of the agreement] and to contribute to the substance and form of this [a]greement." Finally, the agreement provides that "[b]oth parties hereby jointly and severally acknowledge their complete understanding of [the] legal and other effects of this [a]greement." The plaintiff has provided no explanation as to why, in light of these facts, the trial court's finding should be disturbed, and we are aware of none.

We also disagree with the plaintiff that the trial court incorrectly determined that the postnuptial agreement was not unconscionable at the time of dissolution. The plaintiff's claim of unconscionability is predicated on the fact that the postnuptial agreement excluded from the definition of "joint property" any interest the parties had "in any deferred, defined contribution, defined benefit or other pension, retirement or profit sharing plan," as well as certain other employment related assets that had not yet vested and/or were subject to forfeiture or clawback.[15] The plaintiff contends that, if these assets had been included as joint property under the agreement, her share of the marital estate would have been substantially more than $1,326,849, the amount she ultimately was awarded. As we have explained, however, "[u]nfairness or inequality alone does not render a postnuptial agreement unconscionable; spouses may agree on an unequal distribution of assets at dissolution. [T]he mere fact that hindsight may indicate [that] the provisions of the agreement were improvident does not render the agreement unconscionable. . . . Instead, the question of whether enforcement of an agreement would be unconscionable is analogous to determining whether enforcement of an agreement would work an injustice. . . . Marriage, by its very nature, is subject to unforeseeable developments, and no agreement can possibly anticipate all future events. Unforeseen changes in the relationship, such as having a child, loss of employment or moving to another state, may render enforcement of the agreement unconscionable." (Citations omitted; internal quotation marks omitted.) *Bedrick* v. *Bedrick*, supra, 300 Conn. 705–706. The plaintiff, however, has not identified a single change of circumstance—in her life, in the defendant's life or in the lives of their children—that would warrant the conclusion that enforcement of the parties' postnuptial agreement would be unconscionable. But cf. id., 707 (enforcement of postnuptial agreement was unconscionable because economic circumstances of parties had changed dramatically since execution of agreement eighteen years earlier). We therefore conclude that the trial court correctly determined that the postnuptial

agreement was not unconscionable at the time of disso-
lution.

## III

The plaintiff finally claims that the trial court improp-
erly based its custody orders on the testimony of
Amendola, the guardian ad litem for the parties' chil-
dren. The plaintiff contends that the trial court should
not have considered Amendola's testimony in determin-
ing the best interests of the children because, at trial,
Amendola stated that she had not seen the children in
two years. The defendant responds that it is clear from
the record that the trial court based its custody orders
on a careful evaluation of the all of the evidence and
in consideration of the various relevant factors set forth
in General Statutes § 46b-56 (c).[16] The defendant further
contends that there is nothing in the record to indicate
that the trial court based its custody orders on Amendo-
la's testimony but that, even if it did, it was well within
the court's discretion to do so. We agree with the
defendant.

The following additional facts are relevant to our
resolution of this claim. In September, 2014, the court
appointed Amendola as guardian ad litem for the par-
ties' children, who were eight and six years old at the
time. Amendola met with the children only once, shortly
after her appointment. At trial two years later, she rec-
ommended that the parties share joint legal and physical
custody of the children with the defendant having final
decision-making authority. Amendola's recommenda-
tion was founded on her frequent and ongoing phone
and e-mail correspondence with the parties; her review
of the relevant pleadings, court transcripts, and corre-
spondence between the parties; her attendance at depo-
sitions and court proceedings; her conversations with
and review of reports prepared by Adamakos, the court-
appointed psychologist who performed the forensic
custody evaluation; and information obtained from the
children's schools. Amendola further testified that,
although she was in frequent contact with the plaintiff
and the defendant, she chose to meet with the children
themselves only once due to their tender years and to
keep them as far removed from their parents' marital
conflicts as possible. Amendola explained that she
relied on Adamakos to keep her apprised of the chil-
dren's progress rather than meet with them directly.

The record reveals that Adamakos met with each of
the children individually for a period of one hour on
November 25, 2015, December 9, 2015, June 6, 2016,
and June 23, 2016. He also conducted home visits during
which he observed the children's interaction with their
parents. On the basis of these visits and observations,
Adamakos prepared two custody evaluation reports,
dated January 10, 2016, and July 25, 2016, respectively,
which were entered into evidence at trial. In his reports,
Adamakos described the children as extremely well-

adjusted and noted that they appeared to enjoy an equally close and loving relationship with each of their parents.

At trial, Adamakos recommended that the parties share joint legal custody and that the children primarily reside with the plaintiff and spend alternating weekends from Thursday evening to Sunday evening with the defendant, as well as Thursday after school until Friday morning during weeks that the children would not be spending the upcoming weekend with the defendant. He also recommended that the parents engage the services of a coparent coordinator "to help [them] make decisions [and] break a deadlock, if you will . . . ." When asked whether he was aware that the defendant had arranged with his employer to adjust his work schedule so he could be more available for the children, Adamakos testified that, "if [the defendant is] more available, he's certainly a capable parent, and children benefit from both parents, so I would think that maybe more time than I recommended would be appropriate." With respect to the parties' ability to coparent, Adamakos agreed with Amendola's assessment that "it's difficult for the plaintiff to consider [the defendant's] perspective" and "that anger and resentment have compromised [the plaintiff's] ability to empathize with [the defendant]" in matters pertaining to the children. Adamakos further testified that the plaintiff, whom he described as "controlling" and "rigid," "does not want to have to negotiate with the defendant over anything that has to do with parenting," that she has "egocentric qualities about how she makes decisions," which have "marginalized" the defendant, that there are times "when the plaintiff . . . intentionally interferes with [the defendant's] time with the children," that the plaintiff "sees herself as the authority with respect to the children," and that the plaintiff "is blind . . . to understanding the downside, the negative consequences of [her behavior] . . . ."

On the basis of this and other testimony, the trial court awarded the parties joint legal and physical custody of their children, with the defendant having final decision-making authority. In support of its decision, the court found, among other things, that, although both the plaintiff and the defendant are good parents, the defendant has "more insight into the children's developmental needs, activities, education and environment," and has structured his work schedule so that he has additional time off to be with the children during the week.

"This court has consistently held in matters involving child custody . . . that while the rights, wishes and desires of the parents must be considered it is nevertheless the ultimate welfare of the child [that] must control the decision of the court. . . . In making this determination, the trial court is vested with broad discretion

which can . . . be interfered with [only] upon a clear showing that that discretion was abused." (Citations omitted; internal quotation marks omitted.) *Ridgeway* v. *Ridgeway*, 180 Conn. 533, 541, 429 A.2d 801 (1980). Thus, a trial court's decision regarding child custody "must be allowed to stand if it is reasonably supported by the relevant subordinate facts found and does not violate law, logic or reason." (Internal quotation marks omitted.) *Gallo* v. *Gallo*, 184 Conn. 36, 44, 440 A.2d 782 (1981). Under § 46b-56 (c), the court, in determining custody, must consider the best interests of the child and, in doing so, may consider, among other factors, one or more of the sixteen factors enumerated in the provision.

"[T]he authority to exercise the judicial discretion [authorized by § 46b-56] . . . is not conferred [on] this court, but [on] the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one [that] discloses a clear abuse of direction can warrant our interference." (Internal quotation marks omitted.) *Gallo* v. *Gallo*, supra, 184 Conn. 44–45; see also *Yontef* v. *Yontef*, 185 Conn. 275, 279, 440 A.2d 899 (1981) ("[i]t is a rare case in which a disappointed litigant will be able to demonstrate abuse of a trial court's broad discretion in [child custody] matters").

The plaintiff's sole contention with respect to the custody orders is that, "[b]ecause [Amendola] did not have frequent or recent contact with the children and because she did not do an investigation into the children's best interest[s], the trial court should not have adopted her recommendations." To be sure, Amendola had minimal personal contact with the children during the pendency of the dissolution action, which she apparently believed was in their best interests. There is nothing in the record to suggest, however, that she did not conduct an investigation into the children's best interests. To the contrary, as we previously noted, Amendola testified that, from the time of her appointment as guardian ad litem until the time of trial, she was in regular communication with the parties, she read Adamakos' reports and consulted with him about his findings, and she attended all court proceedings and depositions. In light of the foregoing, the plaintiff's assertion that Amendola conducted no investigation is without merit.

The plaintiff contends, nonetheless, that it was improper for the trial court even to consider Amendola's recommendations in light of her testimony that she had not seen the children in two years. We rejected a nearly identical claim in *Blake* v. *Blake*, 207 Conn. 217, 541 A.2d 1201 (1988), and our reason for doing so is fully applicable to the present case. In *Blake*, the defendant,

Benson P. Blake, claimed that the trial court, in deciding custody in that case, improperly had considered the expert opinions of the court-appointed custody evaluator and a family relations officer, whose views were based on information they had obtained between eight and sixteen months before the custody hearing. See id., 224. In rejecting Blake's claim, we acknowledged that a trial court, in making a custody determination, is bound to consider "the *present* best interests of the child at the time of the custody determination." (Emphasis in original; internal quotation marks omitted.) Id. We explained, however, that "[t]he delay between [the witnesses'] examination of each child and their testimony at the custody hearing simply affects the weight of their testimony rather than its admissibility." Id., 225. We further explained that the "standard of review in domestic relations cases is a very narrow one. We will not reverse a trial court's rulings with regard to custody . . . unless the court incorrectly applied the law or could not reasonably have concluded as it did." Id. Finally, we observed that Blake "had a full opportunity at the custody hearing to point out any deficiencies concerning [the witnesses'] examination of the children, and ha[d] failed to demonstrate any substantial prejudice as a result of the delay between the time [they] interviewed each child and when custody was determined." Id.

As in *Blake*, the plaintiff in the present case had a full and fair opportunity to cross-examine Amendola about any possible deficiencies concerning the time she had spent with the children and how, if at all, any such deficiencies impaired her ability to form a legitimate opinion as to their best interests.[17] The plaintiff has also failed to demonstrate that Amendola's limited contact with the children prejudiced the plaintiff in any way. Indeed, Adamakos, who spent far more time with the children, largely agreed with Amendola's recommendations. Specifically, Adamakos agreed with Amendola that both of the parties were exceedingly capable and loving parents and should have joint legal custody of the children. Although he recommended that the children reside primarily with the plaintiff, it appears that that recommendation was based on his perception that the defendant's work schedule prevented him from spending as much time with the children as the plaintiff. When informed that the defendant had arranged with his employer to be more available to the children, Adamakos responded that the defendant is "certainly a capable parent . . . so I would think that maybe more time than I recommended would be appropriate." Finally, Adamakos agreed with Amendola that the plaintiff's controlling nature and refusal to involve the defendant in decisions affecting the children were highly detrimental to the defendant's relationship with the children. Whereas Amendola recommended that the defendant be given final decision-making authority over the

children, Adamakos recommended that that authority be given to a court-appointed "coparent coordinator." Thus, in the end, the trial court's custody determination came down to a determination of whether the plaintiff, the defendant, or a coparent coordinator should have final decision-making authority when the parties are unable to agree about the children. In light of the trial court's finding that the defendant has more insight into "the children's developmental needs, activities, education and environment," it was hardly an abuse of discretion for the court to conclude that it was most appropriate that the defendant be granted the right to exercise final decision-making authority.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] A postnuptial agreement is an agreement entered into during marriage, setting forth each spouse's legal rights and obligations upon death or divorce. See, e.g., *Bedrick* v. *Bedrick*, 300 Conn. 691, 693 n.1, 17 A.3d 17 (2011). The term ordinarily refers to an agreement between spouses at a time when they plan to remain married and neither separation nor divorce is imminent. See id.

[2] At the time of the parties' trial in 2016, the plaintiff and the defendant were 40 and 38 years of age, respectively.

[3] We note that, prior to trial, the defendant obtained an order closing the courtroom for certain testimony and sealing certain exhibits, records and documents offered into evidence at trial, including, inter alia, the terms and conditions of the defendant's employment with Two Sigma Investments. The defendant's base salary and any findings of fact with respect to the defendant's income, however, were not covered by the order.

[4] Paragraph 4.11 (a) of the parties' postnuptial agreement defines "aggregate net worth" as the "value of the parties' [j]oint [p]roperty . . . *less* (1) the aggregate amount of the separate liabilities of the [parties] . . . (2) the sum of all taxes of any kind [that] would be owing in the event of a hypothetical immediate liquidation of all [j]oint [p]roperty as of the date of the [divorce] decree . . . (3) the sum of all taxes of any kind [that] would be owing in the event of a hypothetical immediate exercise of all vested stock options held by the parties or either of them, and the immediate sale of the resulting shares of stock as of the date of the [divorce] decree . . . and (4) the sum of all taxes of any kind [that] would be owing with respect to any vested [employment related] assets (other than options) held by the parties or either of them in the hypothetical event that said vested [employment related] assets were fully taxable to the party in question as of the date of [t]he [divorce] [d]ecree." (Emphasis in original.)

[5] The revocation agreement provides in relevant part: "Each of the [plaintiff] and the [defendant] declare[s] and acknowledge[s] that each has had independent counsel of his/her own selection. Each of the [plaintiff] and the [defendant] further declare[s] and acknowledge[s] that each was afforded a reasonable and ample opportunity to consult with his or her counsel prior to the execution of this [a]greement. The [plaintiff] has been represented by Attorney Andrew Nemiroff, and the [defendant] has been represented by Attorney Wayne Effron." In fact, contrary to the terms of the agreement, Effron neither represented nor otherwise advised the defendant either with respect to the parties' mediation agreement or with respect to the revocation agreement.

[6] It bears noting that, under the defendant's view of the revocation, it was, in effect, legally superfluous because it would be unenforceable if the parties did not reach a mediated resolution of their case, and, if they did resolve the case, the parties' settlement agreement would, as Segall observed in his December 20, 2013 e-mail to the parties, "effectively override" the revocation agreement. As we previously discussed, it is apparent that the defendant agreed to revoke the postnuptial agreement only because the plaintiff requested such a revocation and the defendant believed that accommodating the plaintiff in that regard might serve to promote an amicable resolution of their case.

[7] The enforcement of postnuptial agreements is subject to heightened scrutiny because of the special nature of the marital relationship. As we

have explained, "[t]he circumstances surrounding [postnuptial] agreements . . . are pregnant with the opportunity for one party to use the threat of dissolution to bargain themselves into positions of advantage." (Internal quotation marks omitted.) *Bedrick* v. *Bedrick*, supra, 300 Conn. 701. Moreover, "the spouses to a postnuptial agreement . . . in contracting with one another . . . are certainly less cautious than they would be with an ordinary contracting party. With lessened caution comes greater potential for one spouse to take advantage of the other." Id., 703.

[8] That provision, paragraph 4.9 (b) of the postnuptial agreement, provides that, if either party seeks to invalidate a part of the agreement or seeks to recover property or alimony in contravention of the agreement, that party shall pay all of the attorneys' fees and costs incurred by the other party in defending his or her rights under the agreement. The trial court found the provision to be "unfair, inequitable and unconscionable" and, therefore, unenforceable because it sought "to add an onerous financial penalty to either party who contests the efficacy of the postnuptial agreement . . . ." This conclusion of the trial court has not been challenged on appeal.

[9] The plaintiff appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[10] We note that the guardian ad litem has filed a brief in support of the position of the defendant seeking affirmance of the trial court's order with respect to the issue of custody.

[11] We note that the parol evidence rule did not bar consideration of extrinsic evidence for the purpose of determining whether, as the trial court concluded, Segall had "misrepresented the efficacy and use" of the revocation agreement by virtue of his failure to clarify that the representations on his website, in his December 20, 2013 e-mail and in the mediation agreement were not intended to create a condition precedent to the revocation agreement's enforceability, "As a matter of common law, a party to a contract . . . may rescind that contract and avoid liability thereunder if that party's consent to the contract was procured either by the other party's fraudulent misrepresentations, or by the other party's nonfraudulent material misrepresentations." *Munroe* v. *Great American Ins. Co.*, 234 Conn. 182, 188 n.4, 661 A.2d 581 (1995). Likewise, misrepresentations by one who is *not* a party to the contract may also render the contract voidable by the party misled by the misrepresentation. Specifically, "[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction." 1 Restatement (Second), Contracts § 164 (2), p. 445 (1981); see also, e.g., *Kenda Corp.* v. *Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 224 (1st Cir. 2003) ("[p]rinciples of contract law permit rescission of a contract even when the misrepresentations at issue were made by a [nonparty] to the contract"). In the present case, there is no evidence that the plaintiff gave anything of value in exchange for the defendant's agreement to revoke the postnuptial agreement. Indeed, the plaintiff herself testified that no new promises, undertakings or consideration was exchanged in connection with the agreement. There also is no evidence that the plaintiff materially changed her position in reliance on the agreement, which, by her own admission, did no more than purport to restore to the courts the authority to allocate and distribute the parties' marital estate in the event of a divorce. Accordingly, the trial court's decision would be sustainable even if we, like the trial court, were to treat the issue presented as sounding in misrepresentation rather than one involving a condition precedent.

[12] The plaintiff also asserts that the trial court's findings concerning the defendant's understanding as to the unenforceability of the revocation agreement are clearly erroneous because, soon after mediation broke down, the defendant filed a motion to amend the proposed parenting agreement that Segall had drafted for the parties to file with the court in order to meet a case management deadline. The plaintiff argues that, if the defendant had truly believed that agreements reached during mediation were binding only if the parties reached a final settlement, "there would be no point in modifying the proposed parenting plan after the mediation concluded." To the contrary, the defendant may have filed the motion to amend the proposed parenting plan simply to obtain a more suitable plan in light of the parties' changed circumstances, which included, among other things, the defendant's decision to move out of the marital home following the termination of

mediation and the plaintiff's simultaneous decision to return to school as a full-time student. In any event, the trial court was not required to infer that the defendant believed that he was bound by the revocation agreement merely because he filed the motion to amend the proposed parenting plan.

[13] Because we conclude that the trial court correctly determined that the revocation agreement was unenforceable in the absence of a final mediated settlement agreement, we need not address whether the trial court correctly concluded that the agreement was unenforceable for the additional reason that the defendant did not have access to an attorney prior to signing it.

[14] We note, preliminarily, that "we generally review a trial court's discretionary decision in a domestic relations case using the clearly erroneous standard of review . . . . [I]n the present case, [however] we must apply the legal standards described [herein], namely, whether the terms of the agreement were fair and equitable at the time of execution and not unconscionable at the time of dissolution, to the underlying facts. Accordingly, the question of whether the agreement was enforceable is a mixed question of fact and law subject to plenary review." (Citation omitted.) *Bedrick* v. *Bedrick*, supra, 300 Conn. 706.

[15] The specific assets that the plaintiff claims should have been included as joint property are sealed. See footnote 3 of this opinion.

[16] General Statutes § 46b-56 (c) provides: "In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of the following factors: (1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision."

[17] In support of her claim that the trial court abused its discretion in considering Amendola's testimony, the plaintiff relies on *O'Neill* v. *O'Neill*, 13 Conn. App. 300, 536 A.2d 978, cert. denied, 207 Conn. 806, 540 A.2d 374 (1988). In *O'Neil*, however, the Appellate Court ordered a new custody hearing not because the trial court, in determining custody, improperly considered the testimony of a particular witness but, rather, because the court had relied entirely on a thirteen month old family relations officer's report notwithstanding the officer's testimony "that due to the passage of time he could not competently testify as to whether the parties' stability and security had changed since his report." Id., 303. The Appellate Court explained that the report was not probative of the best interests of the child at the time of the custody determination; see id.; and that, "[t]o compound its error in relying on outdated evidence [that was] not probative of present parenting abilities, the trial court admitted that it placed great weight on the [outdated] written report . . . ." Id. In contrast to *O'Neill*, the plaintiff

in the present case does not claim that the trial court's custody decision was based on stale, rather than current, information about the parties and their children.

———————————————